## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 11 2019, 8:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael D. Gross
Lebanon, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of S.H., Father, F.V.,[1] Mother, and S.H., Child:

S.H.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

March 11, 2019

Court of Appeals Case No.
18A-JT-2148

Appeal from the
Boone Circuit Court

The Honorable
J. Jeffrey Edens, Judge
The Honorable
Sally E. Berish, Magistrate

Trial Court Cause No.
06C01-1711-JT-436

---

[1] We note that the juvenile court also terminated Mother's parental rights to Child. Although Mother does not participate in this appeal, pursuant to Indiana Appellate Rule 17(A), a party of record in the trial court is a party on appeal



*Appellee-Petitioner.*

**Kirsch, Judge.**

S.H. ("Father") appeals the juvenile court's ruling that terminated his parental rights as to S.H. ("Child"), raising the following restated issue: whether the juvenile court committed clear error in finding that there was a reasonable probability that the conditions that led to Child's removal would not be remedied.

We affirm.

## Facts and Procedural History

Child was born on December 6, 2011, the son of Father and F.V. ("Mother"). *Ex. Vol. 3* at 23. On May 4, 2016, Father was charged with five felony counts: 1) dealing methamphetamine, a Level 5 felony; 2) possession of methamphetamine, a Level 3 felony; 3) unlawful possession of a firearm by a serious violent felon, a Level 4 felony; 4) dealing in a narcotic drug, a Level 4 felony; and 5) possession of a narcotic drug, a Level 5 felony ("the initial drug case"). *Id.* at 164-66. On May 23, 2016, the Indiana Department of Child

Services ("DCS") filed a child in need of services ("CHINS") petition, alleging in part, that Father: 1) was arrested on drug-related charges; 2) had left Child with unfit caregivers; and 3) was incarcerated and unable to care for Child. *Id.* at 23-26.[2] Less than one month after the petition was filed, Father was charged with several driving violations, including driving while suspended ("the initial motor vehicle case"). *Id.* at 169-71; 172-80.

[4] The juvenile court heard the CHINS petition on August 11, 2016. On September 2, 2016, it issued its "Order on Fact Finding Hearing," finding, *inter alia*, that Father "admitted the coercive intervention of the Court is necessary . . . due to his inability to provide for the [C]hild due to incarceration." *Id.* at 34. On October 11, 2016, the juvenile court entered its dispositional and parent participation orders, directing Father into reunification services. *Id.* at 36-42; 43-48. Among other things, the juvenile court ordered Father to: 1) follow all terms of probation imposed in a previous criminal case; 2) obey the law; and 3) become "an effective caregiver who possesses the necessary skills, knowledge and abilities to provide the [C]hild with this type of environment on a long-term basis to provide the child with permanency." *Id*. at 40-41.

[5] On January 12, 2017, the State alleged that Father violated the conditions of bond in the initial drug case; Father was subsequently arrested on February 6,

---

[2] Mother's parental rights were also terminated, but because she does not appeal, we only set forth those facts necessary to resolve Father's appeal.

2017. *Id.* at 159. He bonded out on May 26, 2017. *Id.* at 160. On January 30, 2017, the State filed new motor-vehicle related charges against Father, including driving while suspended, a Class A misdemeanor. *Id*. at 182-84; 186-90; 192-94.

[6] About five weeks later, on March 6, 2017, the juvenile court held a periodic case review hearing and found that Father had "not complied with the case plan," was incarcerated, and "was not participating in services before his re-incarceration." *Id.* at 52-53. It also found that Father had not cooperated or even communicated with DCS. *Id.* at 53. At the May 15, 2017 permanency plan hearing, the juvenile court changed Child's plan to a concurrent plan of reunification and adoption. *Id.* at 56.

[7] About two months later, on June 29, 2017, the State filed new drug and motor vehicle charges against Father, alleging that he possessed methamphetamine and paraphernalia, and that he was driving while suspended. *Id.* at 199-202, 203-04, 206-11. Then, on July 12, 2017, Father was arrested in the initial drug case, apparently for violating the terms of his bond release. *Id*. at 161.

[8] On July 24, 2017, the juvenile court held a second periodic case review hearing and found that Father 1) had not complied with the case plan, 2) had not enhanced his ability to fulfill parental obligations, 3) had continued to use illegal substances, and 4) was not cooperating with DCS. *Id.* at 58-59. It also found that Father was willing to participate in substance abuse treatment while incarcerated but not when he was released: "He continues to test often positive

for amphetamine and methamphetamine." *Id.* at 58. As to visitation, it observed that Father "has only requested visits at those times he is incarcerated." *Id.* at 59.

[9] On December 29, 2017, the State charged Father with Level 5 felony battery resulting in serious bodily injury for allegedly fracturing the eye socket of one of his fellow inmates at the Boone County Jail. *Id.* at 213-15, 216-17, 219-24. On March 8, 2018, Father signed a tentative plea agreement that would resolve the charges in the battery case and the initial drug case and would impose an aggregate sentence of twenty-eight years with seventeen years executed. *Id.* at 226-31. On April 2, 2018, the juvenile court held a second permanency plan hearing, and maintained the plan as a plan of reunification and adoption. *Id.* at 65.

[10] On November 21, 2017, DCS filed a Verified Petition for Involuntary Termination of Child-Parent Relationship. *Appellant's App. Vol. 2* at 12-14. On June 7, 2018, the juvenile court held the termination hearing. *Tr. Vol. 2* at 2. On August 8, 2018, it terminated Father's parental rights as to Child. *Appellant's App. Vol. 2* at 64-70. In doing so, the juvenile court acknowledged facts that reflected positively on Father, including his activities during his incarceration: 1) completing a drug and alcohol program; 2) visiting Child and Child's siblings; 3) learning how to budget and manage income; 4) learning better parenting skills; and 4) learning how to manage situations that normally trigger his desire to consume alcohol and drugs. *Id.* at 66.

[11] The juvenile court found that the evidence justifying termination of parental rights included, Father: 1) testing positive for amphetamine and methamphetamine; 2) violating the terms of being released on bond; 3) failing to successfully complete even one service required by DCS when not incarcerated; 4) failing to exercise consistent visitation with Child; and 5) failing to cooperate with substance abuse programs. *Id.* at 65-67. As to Father's criminal record, the juvenile court observed that since DCS filed its CHINS petition, Father had been charged with seven felonies and five misdemeanors, resulting in a proposed plea agreement that would impose an aggregate sentence of twenty-eight years with seventeen years executed. *Id.* at 67. The juvenile court acknowledged that Father was eligible to serve his time through Boone County Community Corrections, and that he had a written job offer if placed in Community Corrections, but also noted that local authorities had declined to recommend Father for the program because of his behaviors while incarcerated. *Id.* The juvenile court found that under the proposed plea agreement, Father's executed time would span Child's entire minority. *Id.* Finally, the juvenile court referred to the findings and recommendations of DCS and CASA. Neither DCS nor CASA believed that the conditions that led to Child's removal would be remedied, and both encouraged the trial court to terminate Father's parental rights. *Id.* at 68.

[12] The juvenile court's legal conclusions included the following:

> B) There is a probability that the conditions that resulted in the [C]hild's removal or the reasons for placement outside the home

of the parents will not be remedied. . . . Father ha[s] shown a
habitual pattern of failure to maintain sobriety for an extended
period of time outside of incarceration. . . . Father has shown
progress while incarcerated, however; his anticipated future
incarceration will last beyond Child's minority and substantially
limit his ability to parent effectively;

C) Termination is in the best interest of the [C]hild[.]

*Id.* at 69-70. Father now appeals.

# Discussion and Decision

[13] Father argues that DCS failed to present sufficient evidence to support
termination of his parental rights because it failed to show that there is a
reasonable probability that the conditions that resulted in the removal of Child
or reasons for placement outside the home would not be remedied. *See* Ind.
Code § 31-35-2-4(b)(2)(B)(i). This is so, he claims, because he is "a very
different person than when a petition was first filed in this case." *Appellant's Br.*
at 12. In support, he cites the juvenile court's findings that his visits with Child
during his incarceration had gone well and that he has fully engaged the
services for life skills and substance abuse at Boone County Jail. *Appellant's
App. Vol. 2* at 66. Father urges us to consider these positive responses to services
when reviewing the juvenile court's termination order. *See J.S. v. Ind. Dep't of
Child Servs.*, 906 N.E. 2d 226, 232 (Ind. Ct. App. 2009).

[14] Father correctly observes that the crucial time to judge a parent's fitness to care
for his child is the time of the termination hearing. *A.B. v. Marion Cty. Dep't of*

*Child Servs.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). Since his improvements began at the time of his incarceration, about one year before the termination hearing and continued up to the time of the hearing, Father contends that his "fitness to care for [Child] has never been better despite the fact that his future is uncertain." *Appellant's Br.* at 12.

[15] We recognize that decisions "to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive - so we review them with great deference to the trial courts, recognizing their superior vantage point for weighing the evidence and assessing witness credibility." *E.M. v. Ind. Dep't of Child Servs.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Parental rights are not absolute and must be subordinated to the child's interests. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). Termination of parental rights is proper where the child's emotional and physical development is threatened. *In re D.P.*, 994 N.E.2d 1228, 1231 (Ind. Ct. App. 2013). The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

[16] When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that most favor the judgment. *Id.* Moreover, because of the juvenile court's unique position to assess the evidence, we will set aside the juvenile court's termination order only if it is clearly erroneous. *Id.* at 148-49. A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004).

[17] Where the juvenile court enters specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* If the evidence and inferences support the juvenile court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*.

[18] Before a juvenile court may terminate parental rights, the State must allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof is clear and convincing evidence. *In re H.L.*, 915 N.E.2d at 149. Moreover, "if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added).

[19] In determining whether there is a reasonable probability that the conditions that led to a child's removal would not be remedied, we engage in a two-step analysis, first ascertaining what conditions led to the child's removal and, second, determining whether there is a reasonable probability that those conditions will not be remedied. *See K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). The second step requires assessing a parent's fitness at the time of the termination proceeding, considering changed conditions and balancing a parent's recent improvements against persistently bad behavior to determine if there is a substantial probability of future neglect or deprivation. *E.M.*, 4 N.E.3d at 643. Thus, the second step allows a juvenile court to consider a parent's criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *In re D.B.*, 942 N.E.2d 867, 873 (Ind. Ct. App. 2011). The evidence need not rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re K.L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[20] Here, we reject Father's claim that the juvenile court erred in ruling that there was a reasonable probability that the conditions that resulted in Child's removal

would not be remedied. While it is true, as Father argues, that a juvenile court must consider a parent's fitness as of the day of the termination hearing, a juvenile court is not hamstrung by this factor. *See In re K.T.K.,* 989 N.E.2d at 1234. A juvenile court may disregard efforts a parent made only shortly before the termination hearing and weigh more heavily a parent's conduct before those efforts began. *Id.* "In making these decisions, 'the trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *Id.* at 1231-32 (quoting *Bester*, 839 N.E.2d at 152).

[21] In *K.T.K.*, the children were removed from the mother's home for drug related issues. *Id.* at 1232. During the case, the mother tested positive for oxycodone, hydrocodone, cocaine, and benzodiazepines; she was eventually incarcerated. *Id.* at 1232-33. While the mother achieved and maintained sobriety during incarceration, she relapsed a few weeks after her release. *Id.* Even though the mother had made recent remedial efforts to improve her life, the Indiana Supreme Court affirmed the termination order, ruling that the trial court was within its discretion to place less weight on the mother's remedial efforts:

> [T]he trial court was within its discretion to consider that the first eleven months of her sobriety were spent in prison where she would have not had access to any illegal substances, nor be subjected to the type of stressors - namely the responsibility of maintaining a household and raising three young and active children - that would normally trigger a desire to pursue an escape from the pressures of everyday life that drugs often provide.

*Id.* at 1234. Thus, the Supreme Court ruled that termination of parental rights was not clearly erroneous, even though the mother had demonstrated recent improvements. *Id.*

[22] The same reasoning applies here. As in *K.T.K.*, the juvenile court was free to conclude that Father's improvement during the time leading up to the termination hearing was the product of the controlled environment of prison life and did not show that Father had sufficiently matured to remedy the conditions that had led to the removal of Child. This was a reasonable conclusion given Father's habitual criminal behavior, positive drug screens, refusal to use DCS services, failure to exercise consistent visitation with Child while not incarcerated, and drug and alcohol relapses once released from incarceration. *See Appellant's App. Vol. 2* at 66-67. Thus, the juvenile court was free to discredit Father's evidence of remedial efforts made shortly before the termination hearing. *See K.T.K.*, 989 N.E.2d at 1234. Accordingly, it did not commit clear error in concluding that it was not reasonably probable that Father would remedy the conditions that led to Child's removal. *See* I.C. § 31-35-2-4(b)(2). We, therefore, conclude that the juvenile court did not err in terminating Father's parental rights to Child.

[23] Affirmed.

Riley, J., and Robb, J., concur.